DGUIDRY, J.
This appeal challenges a trial court’s finding that a doctor committed malpractice by giving his patient inadequate discharge instructions. Finding this determination to be neither manifestly erroneous nor clearly wrong, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
This malpractice litigation stems from the treatment of Alfred Samuel by Dr. Terry Jones, a vascular surgeon. At the time, Mr. Samuel had end stage renal disease, or chronic kidney failure, which required continual dialysis treatment. He also suffered from hypertension which made his heart three times the normal size.
In order to receive dialysis treatments, hemodialysis catheters, or access grafts, were inserted into Mr. Samuel’s arms. The access grafts were inserted during surgical procedures at the VA Hospital in New Orleans in October of 1990, and at *45 Our Lady of the Lake Regional ■ Medical Center in Baton Rouge. During an access surgical procedure, grafts (typically made from plastics) are inserted between an artery and a vein so that blood may be diverted from the artery through the graft into the vein. Over time, the arterial flow toughens the vein, enabling it to withstand repeated punctures of at least two needles per dialysis treatment, typically three times a week.
Mr. Samuel first saw Dr. Jones for vascular access problems in January of 1991. On February 4, 1991, Dr. Jones inserted a graft in Mr. Samuel’s left upper arm. It was discovered that the upper left arm graft had become infected and clotted, necessitating that Dr. Jones surgically remove it.
Mr. Samuel was admitted to the Baton Rouge General Medical Center for removal of the upper left arm graft and all forearm grafts. Dr. Jones performed the surgery on the afternoon of April 2, 1991. In removing the upper arm graft, Dr. Jones made an incision dissecting the graft from the brachial artery site first, the vein site second, and he made a third longer incision directly over the graft site. | ^During the course of the procedure, pus was encountered which flowed into the area. Dr. Jones irrigated the area and proceeded to remove the graft. The incisions were closed with sutures and a staple. Part of the wound was left open to allow for drainage. A pressure dressing was applied to his arm, consisting of bandages wrapped with gauze and an ace bandage. The pressure dressing is used to reduce swelling and to stop bleeding from occurring.
The following day, at about 2:00 p.m., Mr. Samuel began to bleed from the left upper arm area. Emma Young, the nurse in charge of his dialysis treatment, noted that his bandage and his bed linens were saturated with blood. Nurse Sylvia Robertson removed the dressing and observed a steady stream of blood pouring out of the upper arm graft which she characterized as arterial blood. Nurse Robertson and other nurses applied direct pressure on the site for about 20 minutes, the bleeding was brought under control, and a new pressure dressing was applied. Nurse Young, who observed the bleeding incident, attested that there was nothing out of the ordinary going on at the time; rather, the nurses were talking among themselves during the incident.
,. Later that evening, a second bleeding incident occurred at approximately 9:00 p.m., when Mr. Samuel bled again from the left arm graft. Nurse Delores Allen applied pressure for about 8 minutes, then applied a new pressure dressing. She no-tifiéd one of Dr. Jones’ partners, who ordered that Mr. Samuel be given two units of blood.
Mr. Samuel remained in the hospital for observation until April 6th. He had no other bleeding episodes, received his dialysis treatment successfully, was eating well and all of his vital signs were normal. He was discharged by Dr. Jones at 9:30 a.m. In a discharge summary compiled by Dr. Jones, it is noted that Mr. Samuel had been given instructions on how to hold pressure in the area should bleeding occur and was told to call if there were any problems.
|4Mr. Samuel was picked up from the hospital about noon by his nephew. Mr. Samuel spent the night at his sister’s home. The following afternoon, Mr. Samuel informed his sister that he bled while she was away from home but was able to control it by wrapping a towel around his arm.
Mr. Samuel returned home on Sunday, April 7. According to his wife, Joyce, Mr. Samuel bled again that evening, pressure was applied to control it and the site was wrapped with gauze. No one called Dr. Jones or any other medical professional to report the two bleeding incidents.
The next morning, Mrs. Samuel left home to take her daughter to school and fill a prescription. She stated that she was *46 gone twenty or thirty minutes. When she returned home, she found, her husband dead, lying in a pool of blood. •.
Mr. Samuel died sometime between 9:30 a.m. and 10:00 a.m as a result of hemorrhaging from the incisions in his left arm. Dr. Robert Batson, a vascular surgeon, believed that Mr. Samuel died from an infection of the brachial artery which caused erosion or disintegration of the bra-chial artery at the site of Dr. Jones’ suture.
In this wrongful death action filed by Mrs. Samuel and her two daughters against Dr. Jones and his corporation, Vascular Surgery Associates of Baton Rouge, Inc., the plaintiffs did not allege that the surgical procedure utilized by Dr. Jones was improper, or that anything Dr. Jones did during the surgery caused Mr. Samuel to bleed to death following his discharge from the hospital. Rather, they alleged Dr. Jones was negligent in his post-operative treatment of Mr. Samuel in three respects. First, they claimed Dr. Jones was negligent for failing to take Mr. Samuel back into surgery after each of the bleeding incidents on April 3rd to explore the upper left arm graft site: Secondly, they posited that Dr. Jones should have kept Mr. Samuel in the hospital an extra day for observation because the discharge nurses did not remove the pressure dressing as instructed the night [.^before his discharge. Lastly, they charged that Dr. Jones failed to give proper discharge instructions to Mr. Samuel and/or his family members regarding the danger of bleeding and what to do in the event that bleeding occurred.
The trial judge found as a fact Dr. Jones did not err in treating Mr. Samuel’s bleeding incidents with observation rather than another surgery. The judge also rejected the claim that Mr. Samuel was discharged too soon, finding no evidence his death would have been prevented had he remained in the hospital another day for observation.
The judge did find, however, that the discharge instructions given to Mr. Samuel were inadequate and constituted a breach of care. Specifically, the judge found the instructions were deficient because Mr. Samuel had not been warned about the seriousness of a potential bleeding episode and was not told to have someone at home with him at all times. Mr. Samuel was found to be 50% at fault in causing his own death, on the basis that, despite having two bleeding incidents after leaving the hospital, Mr. Samuel failed to call the doctor or return to the hospital as instructed.
Dr. Jones and Vascular Surgery Associates appealed, challenging the finding of fault on the part of Dr. Jones. Plaintiffs answered the appeal, contesting the 50% fault allocation to Mr. Samuel.
MOTION TO STRIKE
In their brief, plaintiffs contend that the trial judge erred in failing to find that Dr. Jones’ decision not to take -Mr. Samuel back into surgery was a breach of the standard of care. Defendants filed a motion to strike this portion of their brief oh the basis that plaintiffs failed to appeal or answer the appeal.
The motion to strike is granted. La. Code Civ. P. art. 2133 provides that an appellee must state the relief demanded in the answer to the appeal. . The jurisprudence has interpreted this article to mean an answer to the appeal operates Ras an appeal only from those aspects of the judgment which the answer complains. Lolan v. Louisiana Industries, 95-602, p. 1 n. 1 (La.App. 3rd Cir.11/2/95), 664 So.2d 616, 618 n. 1. Appellees made no reference to the issue of Dr. Jones’ decision not to bring Mr. Samuel back into surgery in their answer, and we find this issue is not properly before this court.
EXPERT WITNESS QUALIFICATION
In their first assignment of error, defendants attack the trial court’s decision to allow Dr. James Hudson to testify as an *47 expert on behalf of the plaintiffs. Dr. Hudson, a surgeon, is the only expert who testified that Dr. Jones breached the standard of care.
Dr. Hudson had been board certified in general surgery and was the Chief of Surgery at Minden Medical Center for some time. He also taught surgery residents at LSU Medical Center in Shreveport. Although Dr. Hudson had not performed the precise operation in question since his surgical residency during the mid-1970’s, he attested that he had done vascular operations in the arms and legs of patients for over 18 years. He also implanted pacemakers and inserted over a thousand central venous catheters for purposes other than dialysis for renal disease patients.
Dr. Hudson stated that he was aware of the standards of care of surgeons and vascular surgeons. He also attested that post-operative care, which was at issue in this case, falls within the field of general surgery, including the management of post-operative bleeding and the discharge of a patient. Acknowledging that vascular surgery is a part of general surgery, Dr. Jones identified several areas where the two overlap, including: recognizing, treating and managing infection in the surgical patient, the care and treatment of a postoperative patient, as well as the discharge of a patient from the hospital.
17At trial, defendants objected to Dr. Hudson’s qualifications, contending that only a vascular surgeon was qualified to render an opinion on the actions of Dr. Jones. The trial court overruled the objection, finding the objection went to the weight to be given to the testimony rather than the admissibility of the testimony. The judge noted that vascular surgery is a subspecialty of general surgery and even Dr. Jones admitted that vascular surgery overlaps with general surgery.
As Dr. Hudson clearly did not have experience in performing access graft removals in renal patients, defendants’ arguments may have merit if the operation itself were under attack. However, plaintiffs did not contend that Dr. Jones did anything improper during the operation. As a general surgeon, Dr. Hudson was qualified to offer an opinion on post-operative care and discharge of a surgical patient. However, the fact that Dr. Hudson was not experienced in treating end stage renal patients goes to the weight of his testimony regarding the adequacy of Dr. Jones’ discharge instructions. Therefore, we find no error on the trial court’s part in allowing Dr. Hudson to offer his opinion on the adequacy of Dr. Jones’ discharge instructions.
LIABILITY
The trial court made a factual finding that the discharge instructions given by Dr. Jones were below the standard of care. This factual determination is governed by the manifest error standard of review. Under that standard of review, set forth in Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993), this court may only reverse a factual determination if we find from the record that (1) no reasonable basis exists for the finding and (2) the finding is clearly wrong or manifestly erroneous.
The trial judge concluded that Dr. Jones was negligent for failing to warn Mr. Samuel about the seriousness of a potential bleeding episode and that he should not be left alone at any time after his discharge from the hospital. This | ^conclusion is supported in the record by the testimony of Dr. Hudson, who testified that he would advise a patient with postoperative bleeding episodes, the cause of which had not been identified and who had not been returned to surgery, not to be left alone. He also added that if it was highly suspect that the patient would bleed again, he would warn the patient not. to stay alone; however, if it was not highly suspect that the patient could bleed again, he would not issue this warning.
*48 Although Mr. Samuel had no further bleeding incidents in the hospital after the two April 3 incidents, the evidence supports the conclusion that the possibility of another episode should have been an issue of significance for Dr. Jones to address with Mr. Samuel. The day prior to Mr. Samuel’s discharge, Dr. Jones ordered that the pressure dressing, which stops bleeding from occurring, be removed from Mr. Samuel’s arm. According to Dr. Hudson, the pressure dressing should have been removed eighteen to twenty-four hours prior to the discharge of the patient, which would allow the patient to be observed to see whether or not he would bleed without the pressure being applied. According to Dr. Hudson, when Dr. Jones determined that his orders had not been followed, he should have kept the patient in the hospital an additional day. Instead, Mr. Samuel was discharged only a couple of hours after the pressure dressing was removed. In light of the two prior bleeding incidents and the failure of the hospital staff to remove the pressure dressing the day before Mr. Samuel’s discharge, we cannot say that the trial court was clearly wrong or manifestly erroneous, in concluding that Dr. Jones’ discharge instructions were deficient.
Likewise, we find no error in the trial court’s conclusion that the defendants’ liability should be reduced by 50% as the result of comparative fault on the part of Mr. Samuel. Despite having two bleeding episodes after being discharged from the hospital, Mr. Samuel failed to call his doctor or any other medical professional l9to report the bleeding problems. Although the discharge instructions were inadequate, Mr. Samuel was instructed to call if there were any problems. We believe, as did the trial court, that a reasonable person in Mr. Samuel’s position had reason to believe that he needed to seek medical treatment after he experienced post-discharge bleeding episodes. Accordingly, we find no manifest error in the assessment of 50% fault to the victim.
CONCLUSION
Based on the foregoing, the judgment appealed from is affirmed. All costs of this appeal are assessed to appellants, Terry R. Jones, M.D. and Vascular Surgery Associates of Baton Rouge, Inc.
AFFIRMED.
FOIL, J., dissents and assigns reasons.
FOGG, J:, dissents and adopts reasons assigned by FOIL, J.